THE STATE OF FLORIDA, EX REL. WILLIAM B. LA-MAR, ATTORNEY-GENERAL, PLAINTIFF, VS. BENJA-MIN F. DILLON ET AL., DEFENDANTS.

1. The right to vote is not an inherent or absolute right generally reserved in bills of rights, but its possession is dependent upon constitutional or statutory grant. Subject to the limitations contained in the Federal Constitution such right is under the control of the sovereign power of the State, and where the Constitution has conferred the right and prescribed the qualifications of electors, the Legislature can not change or add to them in any way; but where the Constitution does not confer the right to vote or prescribe the qualifications of voters, it is competent for the Legislature, as the representative of the law-making power of the State, to do so.

2. Section one of Article six of the Constitution of 1885, prescribing the qualifications of electors at all elections under it, does not apply to elections for municipal officers in this State, but such elections are subject to statutory regulation, and it is competent for the Legislature to prescribe the qualifications of voters at the same.

3. The provision in the third Section of Chapter 4301 of the laws of of 1893 (being "An act to fix the number and provide for the election of the municipal officers of the city of Jacksonville, a municipal corporation existing in Duval county, Florida, and to prescribe their terms of office, and regulate their compensation)," that those persons who, at the time of the holding of any city election, are residents of the city, and who, at the time of the general State election held next preceding, were qualified electors of any of the election districts within said city, shall constitute the qualified electors of said city authorized to vote at such city election, is not in conflict with the general provisions of the criminal law disqualifying persons convicted of certain crimes from voting at any election, and the two can and must be construed in harmony with each other.

4. The Legislature having the right to prescribe the qualifications of voters at municipal elections, may provide the means of ascertaining the persons who possess the qualifications prescribed, and although the action of a ministerial board in ascertaining

35

the qualifications of those given the right to vote may not be given a conclusive effect on the voter's right to cast his ballot, yet an election held under a statute with a provision making the action of such a board, in this respect, conclusive, will not, on this account alone, be set aside, in the absence of any showing that voters were deprived by the action of such board of any rights conferred by the statute.

5. The provision in Section six of Article six of the Constitution, that in all elections by the people the vote shall be by ballot, applies to municipal elections.

6. It is competent for the Legislature to prescribe an official ballot, and prohibit the use of any other, and may also provide for printing the names of candidates regularly nominated by a convention or mass-meeting, or who run as independents, but it can not restrict the elector to voting for some one of the candidates whose names are printed upon the official ballot. The Constitution guarantees to him the right to vote for whom he pleases.

7. The provisions in reference to voting, in the municipal act *supra*, held to restrict the voter at municipal elections in the city of Jacksonville for municipal officers, to vote for some one of the candidates whose names are printed upon the official ballot, and to this extent the act is unconstitutional.

8. Where unconstitutional provisions in a statute can be separated from the valid portions, and the legislative purpose expressed in so much as is good can be accomplished independently of the void part, and considering the entire act, the good and the bad features are not so essentially and inseparably connected in substance, or so interdependent as that it can not be said that the Legislature would not have passed the one without enacting the other, it is the duty of the court to give effect to so much as is good.

9. In the application of the foregoing rule it was held that the rejection of the feature of the municipal act in question restricting the voter to some one of the candidates whose names were printed on the official ballot, did not affect the valid portions of the act, and that an election authorized by it will not be set aside on an attack solely on the ground of the unconstitutionality of the act, and in the absence of affirmative showing that the result would have been different had the illegal portion not existed

State ex rel. Attorney-General v. Dillon et al.—Syllabus.

10. The provision in the third section of the act, *supra*, "that prior to the holding of the first city election as provided herein, there shall be given to each person who was entitled to qualify himself as an elector at the last State election by registration and the payment of his poll taxes for the years 1890 and 1891, and failed to do so, an opportunity to qualify by registering and himself paying his own poll taxes for such years," did not deprive the voter of his right to pay his said poll taxes through an authorized agent, and a payment made through such agent would be a valid payment under the principle *Qui facit per alium facit per se.*

11. The provisions of the act relating to paying the poll taxes mentioned had reference to the poll taxes due under the general revenue law for the years 1890 and 1891, and if no poll taxes were due for said years as required by that law, none were required under the municipal act in question as a prerequisite to the right to vote in the city election held in July, 1893.

12. The Legislature has the power under the Constitution to make the payment of a capitation tax, not exceeding one dollar a year, a prerequisite for voting, and there is no constitutional limitation against the right to require the payment in any one year of delinquent capitation taxes as a prerequisite to the right to vote, provided such taxes do not amount to more than one dollar for each year.

13. The reasonableness or justice of a deliberate act of the Legislature, so long as it does not contravene some portion of the organic law, is a matter for legislative consideration, and not subject to judicial control.

14. The election commissioners named in the fifth section of the act, *supra*, to prepare for, hold and declare the result of the municipal election held in July, 1893, are not officers within the meaning of Section twenty-seven of Article three of the Constitution of 1885, nor are they officers in any sense, but constituted a temporary board for the performance of certain duties in reference to the holding of an election, and their appointment or designation was not necessarily or essentially executive in its nature.

This is a case of original jurisdiction.

STATEMENT.

An information in the nature of a *quo warranto* was filed by the Attorney-General, on behalf of the people of the State of Florida, in this court on the 17th day of October, A. D. 1893, against the defendants, Benjamin F. Dillon and twelve others, alleging in effect that they, without right or legal warrant, have usurped and still do usurp the offices of councilmen of the city of Jacksonville. It is alleged in the information that Thomas W. Roby and sixteen others named were duly appointed by the Governor of the State of Florida to be councilmen for the various wards of said city, under and by virtue of the act of the Legislature approved May 16th, 1889, entitled "An act to amend an act entitled an act to establish the municipality of Jacksonville, provide for its government and prescribe its jurisdiction and powers, approved May 31st, 1887," and that they qualified by taking the oath of office prescribed by law, were duly commissioned as such councilmen, and thereupon entered upon and performed the duties of said offices and exercised the rights, benefits and privileges thereof, until the same were usurped by the defendants.

Thomas W. Roby and the sixteen persons named, it is alleged, constitute the city council of said city, and are still entitled to use, exercise and enjoy the offices of councilmen of said city.

It is further related that the defendants, Dillon and the twelve others mentioned, for the space of eighty days last past, and more, without legal warrant, grant or right whatever, have used and exercised, and still do use and exercise the offices of councilmen of said city, and that they have claimed and still do claim to be councilmen of said city, and to have the right to use and enjoy all the liberties, privileges and fran-

·chises belonging and appertaining to said offices of city councilmen, but that said offices, liberties and franchises, during the whole of said time, have been and still are usurped by them, against the people of the State of Florida.

The information proceeds with the allegations that the claims of the said defendants to the offices in question are based upon the pretense that they were elected to the same at an election for municipal officers pretended to be held in and for the said city of Jacksonville on the 18th day of July, 1893, by virtue of an act of of the Legislature of Florida, approved May 16th, 1893, being Chapter 4301, laws of Florida. This election, and the act under which it was held, are alleged to be invalid, void and in violation of the Constitution of the State of Florida, in this, that at said election, by the terms of the act, a considerable number of the inhabitants and citizens of said city, to whom the Constitution guaranteed the right of suffrage at the time of said election, were denied the right to vote and participate therein, the excluded classes under said act being enumerated under the following heads:

First. All male persons residents of said city at the time of said city election possessing the constitutional qualifications of electors, but who at the time of the general State election held next preceding said city election were not qualified electors by reason only of not having attained the age of twenty-one years.

Second. All male persons residents of said city at the time of said city election possessing all the qualifications of electors, but who at the time of the general State election held next preceding said city election, were not qualified electors by reason only of not having resided and had their domicile, home and place of

permanent abode in the State of Florida for one year at the time limited for registration for such election.

Third. All male persons residents of said city at the time of said city election possessing all the constitutional qualifications of electors, but who at the time of the general State election held next preceding the said city election, were not qualified electors by reason only of not having resided and had their habitation, domicile, home and place of permanent abode in the county of their then residence for six months, at the time limited for registration for said election.

Fourth. All male persons residents of said city at the time of said election who at the time of the general State election held next preceding said city election, and at the time of said city election, possessed all the constitutional qualifications of electors, but were not electors of any of the election districts of said city at the time of said State election.

It is further alleged that the act under which said election was held is unconstitutional for the reason that by its terms only those persons were allowed to vote whose names appear on the registration lists, after the same had been revised by the persons named in the act as election commissioners, without regard to registration in fact, and that by the terms of said act persons were allowed to vote at said city election who were qualified electors at the general State election held next prior thereto, but who had afterwards lost their domicile in the State, and county of Duval, and had not regained the same in time to become an elector at the time of said city election under the provisions of the Constitution; and also that at said election by the terms of said act the qualified electors of said city of Jacksonville were not permitted to vote for whom they pleased, but were restricted in the right of suffrage to vote for such

person or persons whose names were placed upon an "official ballot" by the election commissioners named in the act.

The foregoing are the grounds especially alleged in the information impeaching the validity of the act of 1893, Chapter 4301, under which the election was held.

The defendants, other than Walter F. Coachman, moved to quash the writ of *quo warranto*, and this motion has been treated here as a demurrer to the information. Among the grounds of this motion are the following: That said information shows upon its face that the defendants have not exercised, and are not now exercising, the offices of councilmen of the city of Jacksonville, in the county of Duval, and State of Florida, without legal warrant, grant or right; that said writ shows upon its face that defendants use and exercise the offices of councilmen of the city of Jacksonville under and by virtue of an election held on the 18th day of July, A. D. 1893, under the provisions of an act of the Legislature passed in accordance with the provisions of the Constitution, and approved by the Governor on May 16th, 1893, at which said election they received a majority of all the votes cast; that the Constitution of the State of Florida does not guarantee the right of suffrage to any inhabitant or citizen of the city of Jacksonville, or any other city, at a municipal election; that Section one of Article six of the Constitution of Florida does not fix the qualifications of voters in municipal elections, but is limited by its express terms to elections for State and county officers provided for in the Constitution; and that the Constitution of the State of Florida does not prohibit, either in express terms, or by necessary implication, the Legislature from restricting the voters in any municipal election to

voting for such person or persons as had procured their names to be placed upon an official ballot, as provided in Chapter 4301 of the laws of Florida. There are other grounds of the motion that need not be set out here, as the above present the controlling questions in this case for our decision.

*W. B. Lamar, Attorney-General, Bisbee & Rinehart,* and *F. P. Fleming* for Plaintiff.

*A. W. Cockrell & Son, W. B. Young* and *J. M. Barrs,* for Defendants.

MABRY, J., after stating the facts.

I. It is apparent from the foregoing statement that the invalidity of the municipal election held in the city of Jacksonville on the 18th day of July, 1893, is dependent upon the constitutionality of the act of the Legislature under which it was held. Where usurpation of a public office, or franchise, is alleged by the State, and an information in the nature of a *quo warranto* is filed by the Attorney-General to test the right to hold such office, or enjoy such franchise, it is only necessary ordinarily to allege generally, that the person holding the office, or enjoying the franchise, does so without lawful authority, and in such case, as against the State, it devolves upon such person to show a complete legal right to hold the office or enjoy the privilege in question; but if the information states the facts upon which the charge of usurpation is based and the facts alleged show a clear right in the defendant, it will be held insufficient on demurrer. Town of Enterprise vs. State, 29 Fla., 128, 10 South. Rep., 740, and authorities cited. The information filed in the case now before us charges usurpation of certain mu-

nicipal offices, but it is also shown that the defendants hold the offices by virtue of the election held on the 18th day of July, 1893, and their claim to the same is challenged on the ground that the legislative act under which said election was held is unconstitutional and void. No other grounds for annulling this election are alleged, and hence the constitutionality of the act is the question presented for our determination.

It is contended that the act in question, by its terms, discriminates against certain classes of persons residing in the city of Jacksonville and possessing the constitutional qualifications of electors, and that they are thereby excluded from the right to vote in the city elections, in violation of a constitutional right to do so. The third section of the act under consideration reads as follows: "Those persons who at the time of the holding of any city election, are residents of the city, and who, at the time of the general State election held next preceding, were qualified electors of any of the election districts within said city, shall constitute the qualified electors of said city, authorized to vote at such city election. Each such elector shall vote only in the election district wherein he was at the time of such State election, a qualified voter; provided, however, that prior to the holding of the first city election as provided herein, there shall be given to each person who was entitled to qualify himself as an elector at the last State election by registration and the payment of his poll taxes for the years 1890 and 1891, and failed to do so, an opportunity to qualify by registering and himself paying his own poll taxes for such years, more than two weeks before said first city election." Provisions are then made for the tax collector of Duval county to open his books and receive the poll taxes,

and for the election commissioners named in the act to arrange for the registration of those persons who were entitled to qualify themselves to vote at the last general State election by registration and the payment of their poll taxes for the years 1890 and 1891, but failed to do so. More specific reference to these provisions need not be made in this connection.

According to the plain terms of this act, only those persons were authorized to vote in the municipal election of July 18th, 1893, who were residents of the city, and who, at the time of the general State election held next preceding said municipal election, were qualified electors of some one of the election districts within the city; or who were entitled to qualify themselves as electors at said State election by registration and the payment of their poll taxes due for the years 1890 and 1891, but failed to do so. The act fixes July 18th, 1893, as the date for holding the first municipal election, and we take judicial knowledge of the fact that the general State election held next preceding this election was on the Tuesday succeeding the first Monday in October, A. D. 1892. The Legislature, then, by the terms of the act in question, confined the municipal election to persons residing in the city and who possessed the constitutional qualifications of electors more than eleven months prior to the date of said city election. No provision is made whereby those who had acquired the requisite age, citizenship and residence as prescribed for voting in the general State and county elections, since the last general State election, could vote in the municipal election. This, it is contended, independent of the provisions in reference to other matters, renders the act void. This contention is based upon the theory that Section one of Article six of the Constitution of 1885 applies to municipal elections as

well as to all other elections in this State, and is a limitation upon the powers of the Legislature. Section one of Article six of the Constitution provides that "every male person of the age of twenty-one years and upwards, that shall, at the time of registration, be a citizen of the United States, or that shall have declared his intention to become such, in conformity to the laws of the United States, and that shall have resided and had his habitation, domicile, home and place of permanent abode in Florida for one year, and in the county for six months, shall in such county be deemed a qualified elector at all elections under this Constitution." Here, it is claimed, is the fountain source of the right to exercise the elective franchise in all elections by the people, municipal as well as State and county, and that it is not within the power of the Legislature to curtail or in any way abridge this right. Registration of the qualified electors may be provided for by the Legislature, of course, but counsel for the State insist that registration is not one of the qualifications of an elector and that the Legislature under the power to provide for registration of qualified electors must enact laws that are "reasonable, uniform and impartial, and must be calculated to facilitate and secure, rather than subvert or impede the exercise of the right to vote." The language quoted was employed by Chief-Justice Shaw, in the noted case of Capen vs. Foster, 12 Pick., 488, in discussing the right of the legislature to regulate by registration the exercise of the elective franchise secured by constitutional provision. The authorities are uniform and abundant in support of the position that where the Constitution has prescribed the qualifications of electors it is not in the power of the legislature to take from or add to such qualifications, or to injuriously, unreasonably or

unnecessarily restrain, impair or impede the right of suffrage thus guaranteed by the Constitution. And this constitutional guarantee against unreasonable and unnecessary restraint by legislative enactment extends to all elections provided for by the Constitution, whether state, county or municipal. In People vs. Canady, 73 N. C., 198, it was decided that cities and towns, like counties and townships, were parts and parcels of the state, organized for the convenience of local self-government, and that under the Constitution of North Carolina the qualifications of voters in municipal elections were the same as in state and county elections, and that it was not competent for the general assembly in any way to change the qualifications of voters as fixed by the Constitution. The Constitution of Massachusetts provided as to residence and citizenship that "every male citizen of twenty-one years of age and upwards, excepting paupers and persons under guardianship, who shall have resided within the commonwealth one year, and within the town or district in which he may claim a right to vote six calendar months next preceding any election of governor, lieutenant-governor, senators or representatives, and who shall have paid" certain taxes mentioned or be exempt therefrom, and possessing all other required qualifications, shall have the right to vote in such elections. It was held that an act of the legislature providing that no person thereafter naturalized in any court shall be entitled to be registered as a voter within thirty days of such naturalization, was void and in conflict with the constitutional provision mentioned. By naturalization the person became a citizen and it was competent for the legislature to add to or diminish the qualifications of a voter which had been prescribed by the Constitution. Kinneen vs. Wells, 144 Mass., 497. It was

decided in Ohio (Doggett vs. Hudson, 43 Ohio St., 548), that an act requiring registration in all cases as a condition to the right of suffrage, and allowing the voters only seven specified days within the year in which to register, and which contained no provision for registration after the seven days (though five days thereafter intervened before election day), and no regulation whereby those constitutionally qualified may, upon proof of qualification, and a reasonable excuse for not registering in time, be allowed to vote, and where no means were provided whereby persons necessarily absent at the time fixed for registration may have their names registered, was unreasonable and had a direct tendency to impair the right of suffrage, and as it might disfranchise a large class of persons without fault on their part, it was unconstitutional and void. The following are among many decisions sustaining the same view: State vs. Connor, 22 Neb., 265; Dells vs. Kennedy, 49 Wis., 555; State vs. Baker, 38 Wis., 71; Rison vs. Farr, 24 Ark., 161; Monroe vs. Collins, 17 Ohio, 665; State vs. Butts, 31 Kansas, 537; Edmonds vs. Banbury, 28 Iowa, 267; Cooley's Const. Lim., page 758.

If Section one of Article six of the present Constitution, the one prescribing the qualifications of voters and declaring who shall "be deemed a qualified elector at all elections under this Constitution," applies to municipal elections in this State, there can not be a doubt as to the fate of the act of the Legislature now under consideration. That it does exclude, by its terms, from voting at municipal elections in the city of Jacksonville, persons who may have the qualifications of electors for State and county elections, as prescribed by the section of the Constitution referred to, is beyond question. It plainly excluded all of those residents of said city who may have acquired the qualifications of

voters under the Constitution for State and county elections during a period of over eleven months prior to the first city election, and for longer periods at subsequent elections as they are required to be held biennially after the election in 1893, on the fourth Tuesday in May, and occurring during years in which no general State election will be held. It is then made necessary and unavoidable that we determine whether or not Section one of Article six of the present Constitution has prescribed the qualifications of voters at elections in municipalities created by the Legislature. This question has not been determined by any decision of this court, and no language used in prior decisions made here in reference to municipal corporations had any reference to the precise question now presented. In Attorney-General vs. Connors, 27 Fla., 329, 9 South. Rep., 7, that part of Section 15 of Article XVI of the Constitution providing that "no person shall hold or perform the functions of more than one office under the government of this State at the same time," was under consideration, and it was held that a municipal government created by the Legislature formed no part of the frame-work of the State government as constructed by the Constitution. That the structure of the State government in all of its departments was provided for by the Constitution, and the organization of municipal governments was expressly delegated to the Legislature, but what was said in that case had no reference to the qualifications of electors authorized to vote in municipal governments to be created by the Legislature.

The case of State *ex rel.* vs. Commissioners of Duval County, 23 Fla., 483, 3 South. Rep., 193, was a proceeding by mandamus to compel defendants to perform certain duties preparatory to holding an election in the city

of Jacksonville under the provisions of acts passed by the Legislature in 1887. The defenses interposed were that said acts were special and local, and no notice was given of the intention to apply for their enactment as provided in the 21st section of Article III of the Constitution; that the lieutenant-governor elected under the old Constitution of 1868 presided over the senate and signed said acts; that the title to the same was insufficient under the Constitution; and that in consequence of the omission of certain provisions in sections of the original act in an amendatory act defendants were under no duty to perform them. The conclusion reached upon a consideration of the various provisions of the Constitution, having any bearing on the subject, was that the proviso in Section 21 of Article III of the Constitution in reference to notice for special legislation had no application to legislation in reference to municipalities. The views expressed in the opinion on this subject are correct, but they had reference to the constitutional requirements as to notice for special legislation, and the case is not an authority on the question of prescribing the qualifications of voters at municipal elections. None of the cases in this court discussing the law bearing upon municipal governments under the present Constitution had reference to the question now presented.

Before examining the provisions of our Constitution that are necessary to be considered in disposing of the question, it will be well to fix in mind the legal status of the right of suffrage as exercised under our forms of government. The right to vote is not an inherent or absolute right found among those generally reserved in bills of rights, but its possession is dependent upon constitutional or statutory grant. Subject to the limitations contained in the Federal Constitution, the elec-

tive franchise is under the control of the sovereign power of the states expressed in constitutions or statutes properly enacted. Where a constitution has conferred the right and prescribed the qualifications of electors it, of course, is paramount until amended, and the Legislature can not change or add to them in any way; but where the Constitution does not fix the right of suffrage or prescribe the qualifications of voters it is competent for the Legislature as the representative of the law-making power of the state to do so. These principles are well recognized and fully established by authority in this country. In Kinneen vs. Wells, *supra*, it is said "the qualifications of voters are fixed by state legislation. The requisitions as to ownership of property, citizenship, sex and residence, in connection with the right of voting, vary with the Constitution or laws of the several states. However unwise, unjust or even tyrannical its regulations may be or seem to be in this regard, the right of each state to define the qualifications of its voters is complete and perfect, except so far as it is controlled by the fifteenth article of the amendments of the Constitution of the United States, which provides that 'the right of citizens of the United States to vote shall not be denied or abridged by the United States, or by any state, on account of race, color, or previous condition of servitude.'" On this subject Judge Cooley says, in Constitutional Limitations, page 752: "In another place we have said that, though the sovereignty is in the people, as a practical fact it resides in those persons who by the Constitution of the state are permitted to exercise the elective franchise. The whole subject of the regulation of elections, including the prescribing of qualifications for suffrage, is left by the national Constitution to the several states, except as it is provided

by that instrument that the electors for representatives in Congress shall have the qualifications requisite for electors of the most numerous branch of the state legislature, and as the fifteenth amendment forbids denying to citizens the right to vote on account of race, color, or previous condition of servitude. Participation in the elective franchise is a privilege rather than a right, and it is granted or denied on grounds of general policy; the prevailing view being that it should be as general as possible consistent with the public safety." Ransom vs. Black, 54 N. J., 446; Huber vs. Reily, 53 Penn. St., 112; Anderson vs. Baker, 23 Md., 531.

Guided by the principles announced, we must determine whether or not our Constitution has, in the section prescribing the right of suffrage at all elections under it, fixed the qualifications of voters in municipal elections, or left it with the Legislature. Reference to various provisions of the Constitution will become necessary, and in considering them we are to be mindful of the fact that the present Constitution is a revision of the former one of 1868, and not the establishment of an entirely new and independent instrument. This court has several times recognized this fact in construing clauses in the present Constitution. The 11th section of the Bill of Rights in the Constitution of 1868 provided that "all laws of a general nature shall have a uniform operation." This is omitted in the present instrument. The 17th section of the Legislative Article in the old Constitution provided that "the Legislature shall not pass special or local laws in any of the following enumerated cases, that is to say, regulating the jurisdiction and duties of any class of officers, or for the punishment of crime or misdemeanors; regulating

36

the practices of courts of justice; providing for chang-
ing venue of civil and criminal cases; granting divorces;
changing the names of persons; vacating roads, town
plats, streets, alleys, and public squares; summoning
and empanelling grand and petit juries, and providing
for their compensation; regulating county, township and
municipal business; regulating the election of county,
township and municipal officers; for the assessment and
collection of taxes, for State county and municipal
purposes; providing for opening and conducting elec-
tions for State, county, and municipal officers, and
designating the places of voting; providing for the
sale of real estate belonging to minors or other persons
laboring under legal disabilities; regulating the fees of
officers." By comparing Section 20 of Article III of
the present Constitution, which corresponds with the
17th section of the Legislative Article in the old, it
will be seen that everything relating to municipal or-
ganizations has been entirely eliminated, and no refer-
ence is there made to them except after the provisions
regulating the jurisdiction and duties of any class of
officers, and regulating the practice of courts of justice
the words "except municipal officers," and "except
municipal courts," are added. The old Constitution
provided that "the Legislature shall establish a uni-
form system of county, township and municipal gov-
ernment." The corresponding provision in the new is
that "the Legislature shall establish a uniform system
of county and municipal government, which shall be
applicable, except in cases where local or special laws
are provided by the Legislature that may be inconsis-
tent therewith." Sec. 24, Art. III. The old instru-
ment enacted that the Legislature shall provide by
general law for incorporating such municipal, educa-
tional, agricultural, mechanical, mining and other

useful companies or associations as may be deemed necessary. The same provision is incorporated in the revised Constitution with the word *municipal* left out. Sec. 25, Art. III. The following provision was in the former Constitution, viz: "The Legislature may establish courts for municipal purposes only, in incorporated towns and cities. All laws for the organization or government of municipal courts shall be general in their provisions, and be equally applicable to the municipal courts of all incorporated towns and cities." The corresponding section in the present instrument is that "the Legislature may establish in incorporated towns and cities, courts for the punishment of offenses against municipal ordinances." Sec. 34, Art. V. The changes made in the revised Constitution as shown by the provisions here referred to, it may correctly be said, can not be construed to go any further than to release legislative regulations of municipal corporations from the limitations in the old Constitution in reference to the enactment of general laws on this subject, and to authorize the Legislature now to pass special laws relating to such matters when deemed necessary to do so. Conceding that such was the main purpose of the revisers in making the changes referred to, it is apparent that they eliminated by the changes mentioned all provisions in the old Constitution referring to and recognizing municipal offices as a part of the machinery of government established by that instrument. The old Constitution expressly referred to municipal officers as being embraced within the elective or appointive system under it. This is shown by clauses in the 17th section above quoted, such as "regulating the election of county, township and municipal officers," providing for "opening and conducting elections for State, county and municipal officers."

The entire elimination of such clauses from the provisions referred to leaves no room for any contention so far as the provisions in lieu of them extend, that municipal elections are included in those embraced within the Constitution.

The 27th section of Article IV of the old Constitution reads as follows: ''The Legislature shall provide for the election by the people, or appointment by the Governor, of all State, county or municipal officers not otherwise provided for by this Constitution, and fix by law their duties and compensation.'' Provision was also made that all elections by the people shall be by ballot. The suffrage section in the old instrument, after prescribing age, citizenship and residence at the time of offering to vote as qualifications of an elector, declared that any person mentioned possessing the qualifications prescribed ''shall in such county be deemed a qualified elector at all elections under this Constitution.'' Municipal officers, as is apparent, were recognized under the old instrument, but they were not therein designated, nor was the manner of their selection provided for. The Legislature then was compelled by the terms of the Constitution to resort to one of two methods in filling municipal offices. It had to be done either by election by the people or appointment by the Governor, and if an election by the people was provided for, it had to be by the qualified electors as prescribed in the suffrage clause of that Constitution. It was held by this court before the revision of the Constitution that in the creation of municipal governments by general law of uniform operation the Legislature might under the 27th section of Article IV, provide for the filling of the offices either by appointment by the Governor, or election by the people. Ex parte Wells, 21 Fla., 280. In revising the old Consti-

tution very little material change was made in the suffrage clause.   An alteration appears in providing that the person should be twenty-one years old at the time of registration, instead of at the time of offering to vote, but the portion declaring at what elections the voter shall be deemed a qualified elector, is the same. A very material change, however, is made in the 27th section of Article IV of the old Constitution.   Municipal officers are entirely eliminated, and the corresponding section in the new is that "the Legislature shall provide for the election by the people or appointment by the Governor of all State and county officers not otherwise provided for by this Constitution, and fix by law their duties and compensation."   Sec. 27, Art. III. Certain State and county offices were created and designated by the Constitution, but municipal offices were left to legislative control. In addition to the State and county offices designated it was within the contemplation of the framers of the Constitution that other State or county offices than those designated might become necessary and have to be be created, and hence provision was made that the Legislature should provide for election by the people or appointment by the Governor of all State and county officers not otherwise provided for by the Constitution. This was the completion of the method provided by the Constitution for filling all State and county offices created, or that should be created under the Constitution, and where the elective system for these offices applies or is made applicable, the persons possessing the qualifications under the suffrage clause in Section one of Article six, are the electors.   They are made qualified electors at all elections under this Constitution.   But it was certain that municipal offices were to be created by the Legislature and they were not designated or otherwise provided for

in the Constitution, but express authority was granted
to the Legislature, in Section 8 of Article VIII, to es-
tablish and abolish municipalities, to prescribe their
jurisdiction and powers, and to alter or amend the
same at any time. The limitation being added that
"when any municipality shall be abolished, provision
shall be made for the protection of its creditors." If
the provision in reference to filling offices, in Section
27 of Article III, had been made applicable to muni-
cipal offices, no doubt could exist about the suffrage
clause in Section 1 of Article VI applying to elections
to fill such offices, but the revisers designedly, we must
conclude, released municipal elections from the opera-
tion of Section 27 of Article III, and thereby qualified
the application of the suffrage clause so far as muni-
pal elections are concerned. They are not elections
under the Constitution, wtthin the meaning of the
suffrage section of Article VI, but have been expressly
exempted therefrom. Municipal offices are undoubt-
edly statutory offices, and in the absence of constitu-
tional restrictions are under the control of the Legisla-
ture. Under the Constitution of Illinois it was made
the duty of the general assembly to provide for a
thorough and efficient system of free schools, where
all the children of the state could receive a good com-
mon school education. The mode of organizing and
administering the system was left to the general as-
sembly without any constitutional regulations further
than the mandate to provide for the system. The only
school officers provided for by the Constitution of that
state were a county superintendent in each county,
and a state superintendent of public instruction. As
to the county superintendent the Constitution pro-
vided that his "qualifications, powers, duties, compen-
sation, and the time and manner of election, and term

of office shall be prescribed by law." The general assembly of that state enacted that "any woman of the age of twenty-one years and upwards, belonging to either of the classes mentioned in Article VII of the Constitution of the state of Illinois, who shall have resided in this state one year, in the county ninety days, and in the election district thirty days preceding any election held for the purpose of choosing any officer of schools under the general or special school laws of this State, shall be entitled to vote at such election in the school district of which she shall at the time have been for thirty days a resident; provided, any woman so desirous of voting at any such election shall have been registered in the same manner as is provided for the registration of male voters." In People vs. English, 139 Ill., 632, the question arose as to the right of women to vote for county superintendent of schools, and it was held that, as he was a constitutional officer, the qualifications of electors as prescribed by the Constitution applied to all persons authorized to vote for him, and as the qualified electors under the Constitution were confined to male persons possessing certain qualifications, women were not authorized to participate in such an election. In the later case of Plummer vs. Yost, decided in that state in January, 1893, it was held under the same act that women could vote for all other school officers not provided for by the Constitution. The two cases are not at all in conflict, and the distinction between them is clearly pointed out. While no person was authorized to vote for the election of any officer mentioned in the Constitution unless he possessed the qualifications of an elector prescribed by that instrument, yet this was not true of officers over whom the legislature had complete power and control. It was said: "It can not be

doubted that, in providing for a system of free schools, a form of organization essentially different from the present one might have been adopted. Entirely different officers might have been provided for, and provision might have been made for the designation of those officers by appointment rather than by an election. Accordingly, it is provided by Section 17 of Article VI of the general school law, that in cities having a population exceeding 100,000 the members of the school board of education shall be appointed by the mayor, by and with the advice and consent of the common council, and, unquestionably, a similar mode of appointment of school officers, other than the two above mentioned (provided for in the Constitution) might have been constitutionally adopted. The general assembly having complete control of the subject, had, of course, the power to provide for the choice of these officers by popular vote, but such an election is not necessarily a proceeding identical with the elections provided for in the Constitution, nor is it necessary that the qualifications of those voting for school officers should be the same as those of electors, as defined by the Constitution." To the same effect is the decision in Wheeler vs. Brady, 15 Kansas, 26. It is said in this case: "There is no school district election or meeting provided for in the Constitution; there is no provision as to how school district officers shall be elected, appointed or chosen, and we suppose that no one will claim that they are, by the terms of the Constitution, to be elected at either of the elections provided for in the Constitution; hence it would seem that the legislature would have complete power over the matter; that the legislature might provide for the election or appointment of school district officers as it should choose, when it should choose, in the manner it should choose

and by whom it should choose." The cases of State vs. Cones, 15 Neb., 444, and Belles vs. Burr, 76 Mich., 1, were decided on the same principle. The late case of Coffin vs. Board of Election Commissioners of Detroit, decided by the Michigan court in October, 1893, does not conflict with the decisions above cited. The act of the legislature declared unconstitutional in the Coffin case authorized women to vote at all elections for school, village and city officers, and it was decided that it was not competent for the legislature to confer the elective franchise upon women for the purpose of voting in city elections. Such elections were embraced in the Constitution of that state, and hence the qualifications of electors prescribed by the Constitution for voters at all elections applied. The Constitution expressly referred to city elections and provided that the officers of cities and villages shall be elected at such time and in such manner as the legislature may direct. But the distinction drawn in the cases we have cited was recognized. The opinion says: "These cases involved the validity of acts conferring upon females the right to vote for school district officers, under constitutions which, like our own, name no school district officer, do not prescribe or suggest how such officers shall be chosen, but in express terms relegate to the legislature the duty of providing for and establishing a system of primary schools." In speaking of the power of the legislature to prescribe qualifications of city officers, Judge Dixon said in State vs. Von Baumback, 12 Wis., 310: "As to all offices and public trusts, to which the people, in the exercise of their paramount authority, have impliedly declared who shall be eligible, either by prescribing special circumstances which shall disqualify, or by reserving to themselves or to the appointing authorities a certain

freedom of choice, there are very obvious reasons for holding that eligibility is in the nature of a constitutional right, and that the legislature possesses no power of exclusion not given by the Constitution; but it is manifest that those reasons can not be applied to a mere statutory office which the legislature may create and abolish at will, and concerning which the Constitution contains no express provisions."

A careful examination of all the authorities at hand has not revealed any conflict as to the principles of law announced in the foregoing cases. The right of suffrage is not an inherent right, but is subject to the disposal of the sovereign power of the state. If the Constitution has regulated it in any department of government, it is subject to the limitations of that instrument, but should this matter, important as it is, be entirely relegated to the legislature, or left entirely to its discretion, the only limitations placed upon legislative power are contained in the Federal Constitution. The principles of law here stated must govern us in testing the constitutionality of the act of the Legislature in question, and guided by them the conclusion is inevitable. The Constitution is a limitation upon the powers of the Legislature, and it is incumbent on those who maintain that the Legislature is forbidden to act in the matter to point out the specific provisions of the Constitution containing the prohibition. If we entertain a reasonable doubt about the act being in violation of the plain spirit and provisions of the Constitution, the question must be resolved in favor of the act. There are provisions in the Constitution which apply to municipal corporations, but we do not think that Section one of Article six does. On the contrary, a careful consideration of the provisions of the Constitution applicable impress us with the

view that the revisers have purposely exempted muni-
cipalities from its provisions, and relegated the matter
to the Legislature. We are duly sensible of the grav--
ity of this question, and have given it that considera-
tion which its importance demands. Municipalities are
auxilliaries of state governments, and the rights and
interests affected by them are just as vital and dear as
those involved in state and county governments, and
in some particulars even more so. The justice or wisdom
of constitutional or statutory regulations, however, are
matters not subject to our control, but we must give
effect to the law according to its meaning, to be ascer-
tained by a consideration of all of its provisions. The
authorities cited by counsel on this branch of the case
have been carefully read, and while they sustain fully
the position that the Legislature can not make any un-
reasonable or unnecessary regulations tending to
abridge or impair the right of suffrage secured by the
Constitution, they fall short of establishing the vital
point in this case, that elections to fill municipal offi-
ces created by the Legislature are subject to suffrage
clauses in constitutions with provisions similar to our
own. The decision in Gooding vs. Brown, 22 Fla.,
437, was made under the old Constitution, and it is
clear that the clause in that instrument prescribing the
qualifications of voters was recognized as applying to
municipal elections, as it undoubtedly did, but the
limitations in the present Constitution do not apply to
such elections as we have pointed out. The case of
People vs. Canady, *supra*, was well considered, and
contains a lucid statement of the law, but there it was
clear that the constitutional limitation as to suffrage
did apply to municipal elections. The Constitution of
North Carolina, in broad terms, provided that every
male person twenty-one years old, resident in the state

.572 SUPREME COURT.

State ex rel. Attorney-General v. Dillon et al.—Opinion of Court.

twelve months, and in the county thirty days, shall be an elector. In other sections it was provided that all county and township elections shall be by the qualified voters therein, and that no county, city, town or other municipal corporation shall contract any debt unless by a vote of a majority of the qualified voters therein. There was nothing in the North Carolina Constitution to negative its application to municipal elections, but its provisions showed clearly that it was intended to so apply. The same may be said of the case of Attorney-General vs. Detroit Common Council, 58 Mich., 213. There the clause of the Constitution prescribing the qualifications of voters expressly refers to elections in townships and wards, and there was no question raised as to the application of the suffrage clause to municipal elections. None of the decisions cited conflict with the construction that we are constrained to put upon the clauses of our Constitution. The result is, that none of the grounds alleged in the information for annulling the act in question, based upon the exclusion of the classes of persons mentioned possessing the constitutional qualifications of voters for State and county officers since the general State election in 1892, are availing. The Legislature had complete power over this matter, and in the absence of constitutional limitation its will must prevail.

II. Another alleged ground attacking the validity of the act in question, is that by its terms persons were permitted to vote in the municipal election who were qualified electors at the general State election held next prior thereto but who had afterwards lost their domicile in the State of Florida and county of Duval, and had not regained the same in time to become an elector at the time of the city election. The act confines the right to vote in municipal elections to resi-

dents of the city at the time of the city election, who were qualified electors, or entitled to become such, in any of the election districts within the city at the time of the general State election held next preceding. It is insisted that this will permit persons to vote in the city election who, though qualified electors at the last general State election, may have become disqualified to vote, since said State election, by reason of conviction for crime or other cause. It is not alleged as a matter of fact that any such disqualified persons voted at the election in July, 1893, but the law is claimed to be void because by its terms such persons are permitted to vote.

The election commissioners named in the act are required to prepare a list of the electors qualified to vote in each of the city wards at the last general State election, and this is made the list of electors at the city election, "except that the said commissioners shall add to or strike from the lists the names of such persons as may, as herein provided, appear improperly placed upon or left off said lists, or by reason of subsequent qualification entitled to be added thereto." In making the list of electors for the city election the commissioners are given access to the county registration books, tally sheets and poll lists used at the last general State election, as well as to all other papers in the office or custody of the county supervisor of registration, and in the office of the tax collector of Duval county. The names of the persons on the list when made are required to be published, and the election commissioners from the best information obtainable are to revise the lists so as to contain all and only the names of persons who, at the time of revision, are residents of the city and who were, at the time of the last general State election, qualified electors, of the

election districts in the city, or who have since that time registered and paid their poll taxes as provided in the act. It is also provided that if an elector be challenged he shall make oath that he is a resident of the city and entitled to vote at the election. "If his name appears upon the list of electors for the ward (and, if required, he take such oath), he shall be permitted to vote, but no person whose name does not so appear shall be permitted to vote."

The Constitution provides that no person convicted of any felony by a court of record shall be qualified to vote at any election unless restored to civil rights, and the Legislature is directed to enact the necessary laws to exclude persons convicted of certain crimes from the right of suffrage. Sections 4 and 5, Article VI. In obedience to this command the Legislature has enacted a general law excluding persons convicted of certain crimes from the right of suffrage. Revised Statutes, Section 154, Division 5. There is no purpose manifested in the act under which the election in question was held to repeal the general law in reference to excluding persons convicted of crime from voting at elections, and if the two can be construed in harmony with each other the rule is that it must be done. The act, it is true, declares those persons, residents of the city, who were qualified electors at the time of the last general State election, or entitled to become such by registration and the payment of poll taxes due for 1890 and 1891, qualified and entitled to vote in the city election, and there is in the act no express direction to the election commissioners to strike off the names of persons convicted of crimes disqualifying them to vote at any election, but the reference is to the qualified voters at the last State election, and no purpose is shown to suspend the operation of the crim-

inal laws in reference to crimes disqualifying one to vote. The general law and the act we are construing can be construed in harmony in reference to the conviction of crimes taking away the right of suffrage, and this l eing the case such construction should be given to them. Those who possessed the qualifications of electors at the general State election next preceding the city election and complied with the law as to registration and the payment of poll taxes, or could have done so, were authorized to vote at the city election provided they were at that time residents thereof. Residence of a qualified voter in the city at the time of the election in connection with the qualifications mentioned at the preceding general State election, conferred the right to vote at the city election without regard to changes of residence since the said State election. There is no constitutional prohibition against the power of the Legislature to prescribe such qualifications.

III. It is further alleged that the act is void for the reason that by the terms thereof only those persons were allowed to vote whose names appeared on the lists after the same had been revised by the commissioners of election, without regard to registration in fact. After declaring who should constitute the qualified electors authorized to vote at the city election (being those persons residing in the city at the time of the city election, and who at the time of the general State election held next preceding, were qualified electors of any of the election districts within said city, or who were entitled to qualify themselves to vote at said State election by registering and paying their poll taxes due for the years 1890 and 1891), the act directs the commissioners of election to prepare a list of the electors qualified to vote at each of the city wards at the last gen-

eral State election, and this list, it is declared, shall constitute the qualified electors to vote at the city election, subject to revision and alteration as provided in the act. In making up the list of qualified voters for the city election access was given the commissioners to the county registration books, tally sheets and poll lists used at the last general State election, and all other papers in the office or custody of the county supervisor of registration, and in the office of the tax collector of Duval county. The names of the qualified voters on the list prepared by the commissioners are required to be published, not more than two weeks before the city election, one time in a newspaper with notice of a time and place when the commissioners would meet to revise the list, the notice to be published at least two days before the meeting. At the time and place mentioned in the notice the commissioners were required to meet, and "from the best information obtainable, revise said lists so as to contain all and only the names of persons at that time residents of said city, and who were, at the time of the last general State election, qualified electors of the election districts in said city, or who have since that time registered and themselves paid their own poll taxes for the years 1890 and 1891. Such lists so revised shall constitute the list of qualified voters for the several wards at said city election." It is further provided that not less than five printed copies of the list for each ward shall be made out, on the same form as the county registration books, so as to show the number of registration certificates, age, color, etc., and each copy to be certified to be correct by the chairman of the board of election commissioners. The lists so made and certified are for the use of the inspectors and clerks appointed to hold the election, and they are required to be prepared and open to

State ex rel. Attorney-General v. Dillon et al. —Opinion of Court..

inspection at least five days before the election, and subject to correction of clerical errors by the board of election commissioners. No person whose name does not appear upon the list of electors for the wards shall be permitted to vote.

It is apparent from the provisions of the act that the commissioners were not given arbitrary power to put on the list to be prepared by them such names as they pleased, but it was made their duty to place thereon all and only the names of persons possessing the qualifications of electors prescribed by the act for voting in the municipal election. In ascertaining who were the persons authorized to vote in the city election the commissioners were under a duty to act according to law, and not arbitrarily, and their action in this respect was subject to review by a court of competent jurisdiction. Many authorities hold that where a law provides that no vote shall be received at an election unless the name of the voter is on the registration list as prepared by the registering officers, it is in violation of that portion of the Constitution defining the qualifications of electors. Dells vs. Kennedy; State vs. Conner; Doggett vs. Hudson, and People vs. Canady, *supra*, belong to this class of decisions. They are based upon the theory that the constitutional qualifications of electors apply, and that the Legislature can not by any regulations deprive the voter of a right given him by the Constitution without fault on his part. But as we have already seen, the qualifications of electors prescribed by our Constitution at all elections under it do not apply to municipal elections, hence there is no inhibition in this clause against the authority of the Legislature to make the ascertainment of the elector's right to vote in the city election by the

37

election commissioners conclusive. It may be contended, however, that after prescribing the qualifications of those who were entitled to vote in the municipal election, the Legislature could not confer upon the commissioners the power to conclusively determine who were possessed of the qualifications thus prescribed, on the ground that it was granting to a mere ministerial board judicial powers with which it could not be invested. If it be conceded that the Legislature could not make the ministerial ascertainment by the board of election commissioners conclusive of the voter's rights under the statute, this will not authorize the vacation of the election held in July last on the showing before us. It is not alleged or claimed that any voter was denied his right to vote at said election by reason of the failure of the commissioners to perform their duty under the statute, and for aught we know every person in the city authorized to vote cast his ballot. The Legislature had the right to prescribe the qualifications of voters at such an election, and it was competent for it to provide the means of ascertaining who were the persons authorized to vote. Although the action of a ministerial board in performing the duty of ascertaining the qualified electors under a statute may not be given a conclusive effect as to the voter's rights, and to the extent that the statute before us undertakes to make such action conclusive, it may be inoperative, yet this alone should not invalidate an election in the absence of any showing that voters were deprived of any rights under the statute.

IV. It is also alleged that by the terms of the act in question the qualified electors of the city of Jacksonville were not permitted to vote for whom they pleased, but were restricted in the right of suffrage to vote for persons whose names were placed upon an official bal-

lot by the election commissioners. It has been held by this court that the last clause of Section 6 of Article VI of the Constitution, which is, that "in all elections by the people the vote shall be by ballot," applies to municipal elections. State *ex rel.* vs. Anderson, 26 Fla., 240, 8 South. Rep., 1. We still adhere to this decision. It was here said that "the material guarantee of this constitutional mandate of vote by ballot is inviolable secrecy as to the person for whom an elector shall vote. The distinguishing theory of the ballot system is that every voter shall be permitted to vote for whom he pleases, and that no one else shall be in a position to know for whom he has voted, or shall know unless the voter shall of his own free will inform him." There is no doubt in our minds about the right of the Legislature to prescribe an official ballot and to prohibit the use of any other, and the provisions of the act in reference to printing the names of candidates regularly nominated by a convention, mass meeting, or primary election, or who run as independents, are valid. But the Legislature can not, in our judgment, restrict an elector to voting for some one of the candidates whose names have been printed upon the official ballot. He must be left free to vote for whom he pleases, and the Constitution has guaranteed to him this right. If the Legislature can restrict the voter to some candidate whose name is printed on the official ballot, then it may prescribe such regulations for getting the names of candidates on the ballot as will completely destroy the liberty of choice.

Counsel for defendants contend that while the act prescribes an official ballot, and prohibits the use of any other, and also provides for the printing upon the official ballot to be used, the names of all candidates who have been certified to the election commissioners

as put in nomination by any convention, mass meeting or primary election, as well as indepéndent candidates who have the endorsement for that purpose, of ten per cent., and not less than twenty-five, of the electors qualified to vote for such office, yet it does not prohibit the voter from putting another name by "paster" over the name of any candidate on the ballot, or from erasing the name of any candidate and writing in lieu thereof another of the voter's choice. We have considered the cases cited on this point: Ranson vs. Black, 54 N. J. L., 446; Common Council vs. Rush, 82 Mich., 532, and DeWalt vs. Bartley, 146 Penn. St., 529, and recognize fully the rule that every presumption is in favor of the constitutionality of the law, and that it will require a very clear case to justify a court in striking it down on the ground of unconstitutionality. It is also true that where an act is fairly susceptible of two constructions, one of which conflicts while the other is in harmony with the Constitution, that construction which supports will be preferred to that which destroys the law. City of Emporia vs. Norten, 13 Kansas, 569. The act before us prescribes an official ballot and prohibits the use of any other. Upon each ballot shall be printed in uniform plain type in a single column the names of all the candidates certified to the election commissioners in the manner provided in the act, and the names of all candidates for the same office shall be printed together, and arranged alphabetically according to the initials of their surnames, irrespective of party. Immediately to the left of each name, in a line with the middle of the letters of the name, a dash or short line not less than one-quarter of an inch in length is required to be printed. Specific directions are then given for arranging on the ballot the names of the various officers to be voted for as fol-

lows, *viz:* "On said ballots shall be printed, first, under the head of 'Mayor,' the words 'vote for one,' followed by the names of all the candidates for that office; next under the head 'Councilmen at Large,' the words 'vote for seven,' followed by the names of all the candidates for that office," and so on for all the officers to be elected. On the ballots for councilmen at large on the line with the name, the number of the ward in which the candidate resides is printed, and each ballot is to have attached to it a stub so attached that when the ballot is folded the stub can be detached without injury to the ballot or exposing its contents, upon which stub the number of the ballot for that ward must be printed. Provision is also made for attaching together in blocks the ballots for use at the wards, the number of the ballots to be used, and for furnishing the inspectors of election with the ballots for use on the day of election. It was entirely competent for the Legislature to prescribe the regulations here referred to, and if there were no others on the subject of casting the ballot, we think the voter, although confined to the use of the official ballot, could put upon it the name of any person in lieu of the name of the candidate printed thereon, and such a ballot would be legal. There is in the provisions here referred to no denial, express or implied, of his right to do so, and under the decisions cited we think he would have such right. But in another portion of the same section of the act, in providing for the entrance of the voter into the polling place and the receipt by him of an official ballot, it is enacted that "he shall go to one of the voting shelves, tables or compartments, and there privately cross or check-mark across the dash, or short line in front of the name of the candidate of his choice for each office

to be filled, which cross or check shall constitute his vote." The requirement is that he shall check the name of the *candidate* of his choice. The candidate here referred to can not fairly or naturally mean any other than some candidate whose name had gotten on the ballot in the manner provided in the act. This is the only fair and reasonable construction to be put upon the clause mentioned, and its effect is to restrict the voter to a choice of candidates printed on the ballot, which we have said can not be done. That phase of the act, then, which restricts the voter to checking the name of some candidate on the official ballot is in conflict with the constitutional provision in reference to voting by ballot.

The result just stated gives rise to the question whether the valid parts of the act can remain operative notwithstanding the unconstitutional feature, and whether they are so essentially and inseparably connected in substance that the Legislature would not have enacted the one without the other. If the two can be separated and the legislative purpose expressed in the valid portion can be accomplished independently of the void part, and considering the entire act it can not be said that the Legislature would not have passed the valid part had it been known that the invalid portion must fail, it is our duty to sustain so much as is good. In English vs. State, 31 Fla., 340, 12 South. Rep., 689, and Donald vs. State, 31 Fla., 255, 12 South. Rep., 695, the constitutionality of the act of 1891, reducing a grand jury to twelve persons, and giving eight of the number the right to find a bill, was before us. It was held that the Legislature could not authorize less than twelve grand jurors to find an indictment, but upon consideration of the entire act in which the provision reducing the number to twelve

was found, it could not be said that the Legislature would not have passed the provision making the jury consist of twelve persons had it been known that the other clause authorizing eight to concur in finding indictments could not be carried out. In the Donald case it was said that "the distribution of statutes into sections is, however, purely artificial, and in determining whether the valid parts can remain operative notwithstanding the unconstitutional parts, the point is not whether they are contained in the same section, but whether they are essentially and inseparably connected in substance, or are so interdependent that the Legislature would not have enacted one without the other." The unconstitutional feature of the statute now before us is in requiring the voter to check a candidate printed on the official ballot. If this feature be eliminated the remaining portions of the act are sufficient to authorize an election and permit the electors to vote for whom they please. The leading and controlling purpose of the act was to permit the electors named in it to vote for municipal officers in the city of Jacksonville, and we can not say that the Legislature would not have passed the valid portions of the act if the void feature had been called to its attention. The greatest difficulty we have had on this branch of the case is in determining the effect of the void portion of the act on the election already held. In the case of State vs. Constantine, 42 Ohio St., 437, it was denied on *quo warranto* proceedings that a statute authorizing an election of four members of the police board at the same election, but denying an elector the right to vote for more than two members, and directed the rejection of any ballot with more than two names on it, was in conflict with the Constitution regulating the right to vote by ballot, and that

the members elected at such an election were not duly elected, and should be ousted from their offices. In People vs. Kenney, 96 N. Y. 294, it was held that where part of a statute was unconstitutional, this did not affect the validity of the remainder, unless the provisions are so interdependent that one can not operate without the other, or are so related, in substance and object, that it is impossible to suppose that the Legislature would have passed the one without the other. After striking out the invalid part, if that which remains is complete in itself and capable of being executed in accordance with the apparent legislative intent, it must be retained, and this is so although the condemned portion is found in the same section with the part retained. In this case it was further held, in construing an act providing for the election of aldermen at large of the city of New York, and prohibiting the electors from voting for more than two-thirds of the whole number to be elected, that conceding such a provision, as to voting for two-thirds only, to be in conflict with the Constitution, this did not affect the validity of the residue of the section, or prevent the election of aldermen in the manner specified. It is said: "So far as the case discloses, every voter in the city voted for as many candidates for aldermen at large as he wished to. It does not appear that any voter claimed the right to vote for all the six aldermen, and was denied that right. If he chose voluntarily to waive his constitutional right to vote for six, and to vote for but four, that he could do and his ballot would be a valid ballot." People vs. Perley, 80 N. Y., 624, holds that where a statute prohibits those voting at an election from voting for more than two of three officers to be elected, ballots cast in pursuance of the act are not invalidated by its unconstitutionality

State ex rel. Attorney-General v. Dillon et al.—Opinion of Court.

in part; the fact that the electors exercised in part
only their privilege or duty of voting, does not affect
the votes actually given. The decision in Ander-
son vs. Saucer, 13 La. Ann., 301, was that the principal
object of an election is the casting of votes, and the
unconstitutionality of police provisions of an election
law can not render votes cast illegal, and thus disfran-
chise those who vote; the citizens have the prerogative
of voting, and the Legislature can not, by encompassing
with unconstitutional provisions an election law, make
the votes of electors null and void. The public good
demands that the will of the people as determined at
the ballot box should not lightly be disturbed.

In considering objections to an election on the
ground that the registration law made no provision for
the registration of those who might become qualified
to vote after the registration is closed, and before the
day of election, Judge McCay said, in Weil vs. Cal-
houn, 25 Fed. Rep., 865: "It seems to me that such
objections to the registration ought, for reasons of
public policy, to conform to the rules applicable to ob-
jections to elections not held in strict conformity to
law, to-wit: It should be made affirmatively to appear
that the result would have been different had the ille-
gality not existed. Perhaps the voter might have pri-
vate redress for the wrong done him in refusing his
vote, but that is a very different thing from making an
election void on a mere abstraction not affecting the re-
sult." In the Ohio case cited, the void portion of the
act was regarded as destructive of the whole, but the
other cases mentioned are opposed to this view.

As has already been stated, if we reject the void por-
tion of the act before us, which must be done, what
remains is sufficient to authorize an election, and there
is no allegation that any voter, at the election in ques-

tion, desired to vote for any other person than some candidate on the official ballot, and was as a matter of fact denied the right to do so. The State is standing entirely upon the unconstitutionality of the entire act and the rights of all the voters at the election are involved. The better rule is, it seems to us, that where an election authorized to be held is attacked solely on the ground of the illegality of some of the provisiont of the law under which it is held, but not affecting is as an entirety, it should be made affirmatively to appear that the result would have been different had the illegality not existed.

V. What has been said disposes of all the objections alleged in the information to the validity of the act in question, but others were urged in argument here and insisted on in the briefs filed, and we should notice them. Several objections are made to the provisions of the act requiring the payment of poll taxes by those who were entitled to qualify themselves to vote at the last general State election by registration and the payment of their poll taxes for the years 1890 and 1891, but failed to do so. The first objection under this head is, that the act is void because it requires the voter to pay in person the poll taxes mentioned, and denies him the right to do so by an agent. The language of the act on this subject is: "Provided, however, that prior to the holding of the first city election as provided herein, there shall be given to each person who was entitled to qualify himself as an elector at the last State election by registration and the payment of his poll taxes for the years 1890 and 1891, and failed to do so, an opportunity to qualify by registering and himself paying his own poll taxes for such years, more than two weeks before said first city election." The list of persons authorized to vote at the city election

prepared by the commissioners of election is required to be revised so as to contain "all and only the names of persons at that time residents of said city and who were, at the time of the last general State election, qualified electors of the election districts in said city, or who have since that time registered and themselves paid their own poll taxes due for the years 1890 and 1891." Our construction of the provisions mentioned is, that they do not deprive the voter of his right to pay his poll taxes through an authorized agent, and that a payment made by such agent would be a valid payment under the terms of the act. A liberal construction should obtain in favor of the voter's right to make the payment through another, and the act does not in terms deny such right. It is true it says "himself paying his own poll taxes" for the years mentioned, but the general principle, *qui facit per alium facit per se*, should apply, and the payment through an authorized agent would be the payment by the voter himself. In the case of State *ex rel.* vs. Johnson, 30 Fla., 499, 11 South. Rep., 855, we held that under the statutes regulating the payment of the poll taxes since June 12th, 1892, a tax collector had no right to refuse to receive such taxes when tendered by a party on behalf of others from whom they are due, although the person making the tender was not authorized by the other persons to pay the same. This was the construction put upon the statutes in force since the adoption of the Revised Statutes in reference to paying poll taxes, and no question as to the power of the Legislature to restrict the voter to the payment of such taxes in person arose or was decided in the case. In the present case we hold that the Legislature has not denied the voter the right to pay his poll taxes through another authorized to do so, and that payments made by such

agent must be considered payments made by the voter himself. This being the proper construction to be placed upon the act, it is unnecessary to say anything in reference to the power of the Legislature to require payments in person by the voter.

VI. It is further objected that the act under consideration requires the payment of two poll taxes, that is, poll taxes for both of the years 1890 and 1891, as a prerequisite to the right to vote in the municipal election held in July, 1893. The meaning of the act, and hence the proper construction to be put upon it, is that the class of persons mentioned as being entitled to qualify themselves to vote at the last general State election, by registration and the payment of their poll taxes for the years 1890 and 1891, and failed to do so, shall be permitted to do so by registering before the election commissioners and paying, within the time specified, such poll taxes as they were due for the years 1890 and 1891. The act does not impose upon the class of persons mentioned any poll taxes that were not due for the years 1890 and 1891, but does require the voter to pay within the time mentioned in the act such poll taxes as he would have had to pay in order to vote at the State election in 1892. This is apparent from the language of the act, that they shall "pay their own poll taxes due for the years 1890 and 1891." Under the State registration law the supervisor of registration was directed to note on the books to be furnished the inspectors of the different election districts the names of all persons registered therein who shall have paid, at least thirty days before the day of election, their poll taxes for two years next preceding such election as shown by the lists furnished to the supervisor by the tax collector, and only such persons shall be deemed qualified voters or authorized to vote at any general, special or

municipal election; "provided, that no person shall be prevented from voting on account of not having so paid a poll tax, for any year which shall not have been lawfully assessable against him by reason of his not having been a resident of the State, or not having been of age, and who shall have obtained from such supervisor a certificate to that effect, and shall at the time of offering to vote exhibit such certificate to the inspector of elections." Rev. Stat., sec. 173. The act under consideration has reference to the poll taxes due under the general revenue law for the years 1890 and 1891, and if no poll taxes were due under the requirements of that law, then none could be insisted on under the municipal act as a prerequisite to the right to vote in the city election. If, however, a poll tax was due for either of the years mentioned, it was required to be paid. This is the proper construction to be placed upon the act, we think, and if it is competent for the Legislature to make the payment of the one dollar capitation tax for more than one year in arrear a prerequisite to the right to vote in municipal elections, all objections, as to the right to demand payment of poll taxes from the municipal voters, must fail. The constitutional provisions on this subject are: "The Legislature may also provide for levying a special capitation tax, and a tax on licenses. But the capitation tax shall not exceed one dollar a year, and shall be applied exclusively to common school purposes." Article IX, Section 5. "The Legislature shall have power to make the payment of the capitation tax a prerequisite for voting, and all such taxes received shall go into the school fund." Article VI, Section 8. One dollar a year is the limit authorized to be imposed for a capitation tax, and this tax can be made a prerequisite to the right to vote. There is in

the provisions of the Constitution referred to no limita-
tion against the right to require delinquent capitation
taxes to be paid as a prerequisite to voting; provided
such taxes do not amount to more than one dollar each
year. Neither the State law, nor the act under con-
sideration, requires the payment of more than one
dollar a year for the years 1890 and 1891. It is com-
petent for the Legislature to require the payment of
the capitation tax as a prerequisite to voting, and this
includes all the annual capitation taxes remaining
unpaid, not exceeding of course one dollar for each
year.

Under this head it is further insisted that the re-
quirement as to the payment of poll taxes more than
two weeks before the election is void. This objection
may be considered in connection with the one against
the regulations prescribed as to registration before the
commissioners of those persons who were entitled to
qualify themselves to vote at the last general election
and failed. The provisions, both as to the time of
payment of the poll taxes and the registration of the
persons designated, it is insisted are unreasonable, un-
necessary and tend to impair and subvert the right to
vote. Those persons residing in the city at the time
of the city election, and who at the time of the gen-
eral State election held next preceding, were qualified
electors, were declared by the act to be the qualified
electors in the city election, with a further provision
that those who were entitled to qualify themselves to
vote at said State election by registering and paying
their poll taxes due for the years 1890 and 1891, and
failed to do so, should have an opportunity to register
and pay said taxes two weeks before the city election.
The tax collector's books were required to be kept open
from the first of June, 1893, until the time for paying

poll taxes for the purposes of the election expired. The registration contemplated was to be had under the supervision of the election commissioners. They were directed to meet on or before the 3rd day of July, 1893, and provide for the registration of those to whom the opportunity for registering had been given. We again observe that it is not a constitutional right here regulated, but the conferring of a right by the Legislature not guaranteed by the Constitution. Neither is it alleged or claimed that the election commissioners did not in fact make ample provision for registering all those who were entitled to register, or that any person so entitled did not register and vote. The election is claimed to be void because the regulations as to paying poll taxes and registering are unreasonable and impair the voter's constitutional rights as an elector.

It is not necessary to say what would be our conclusion if we were dealing with regulations of the right of suffrage secured by the Constitution, as the voter at municipal elections under our Constitution has no such right. The Legislature under our system has control of this matter. In the case here the Legislature provided that certain persons should have the right to vote at a municipal election by paying poll taxes in arrear and registering two weeks before the election. The registration contemplated was to be under the control and supervision of the election commissioners, and they were required to meet on or before the 3rd day of July and provide for the registration of those who were given an opportunity to do so. In passing upon the validity of this act we are to be guided by the rule that a deliberate act of the Legislature must be upheld if it can be done without doing violence to the fundamental law. Its reasonableness or justice, so long as it does not contravene some por-

tion of the organic law, is a matter for legislative consideration, and not subject to our control. Should we entertain the view that the time given in the act for registration was unreasonable, the legislative view is different, and as there is no constitutional limitation upon its action in this respect, its will must stand as the law. The attack upon the election held thereunder is based solely upon the sufficiency of the law authorizing it, and such election can not be set aside, especially where there is no showing that any voters were deprived of any rights given by the statute by reason of the failure on the part of the election commissioners to perform the duties imposed upon them.

VII. A further objection is made that it was not competent for the Legislature to appoint or designate the three election commissioners named in the act, for the reason that this was not a legislative function, but executive, in its nature, and hence forbidden to be exercised by the legislative department. The act declares that three persons named shall constitute "a board of election commissioners to make all the necessary preparations for and hold and declare the result of the election to be held July 18th, 1893; and thereafter the board of police commissioners shall perform those duties." The objection here made is not that the Legislature can not provide for a board of election commissioners to make the necessary preparations for and to hold and declare the result of the election, but that the designation of the members of the board is an executive function, and does not belong to the Legislature. It is entirely clear that the three election commissioners provided for in the act are not officers within the meaning of Section 27 of Article III of the Constitution, nor are they officers in any sense, but constitute a temporary board for the performance of certain specified duties.

in connection with holding an election authorized by the Legislature. If the appointment of such a board is inherently and essentially executive in its nature,. the distribution of powers of government under the second article of the Constitution will take it out of the powers of the Legislature. But our conclusion is. that the designation of persons to perform the functions conferred upon the commissioners of election in the act before us is not necessarily or essentially executive, and that the Legislature can exercise such a power. For a discussion of the law bearing on this. subject we refer to the cases of City of Evansville vs. State, 118 Ind., 426; State *ex rel.* vs. Denny, *Ibid,* 449; Hovey vs. State, 119 Ind., 387; Fox vs. McDonald, (Ala.), 13 South. Rep., 416; Barnes vs. Supervisors, 51 Miss., 305; Note to People vs. Freeman, 13 Am. St. Rep., 122 (80 Cal. 233), and authorities cited.

We have maturely considered all the objections presented as to the constitutionality of the act in question, and the validity of the municipal election held under it in July last, and the foregoing pages contain a reference to and discussion of all the material points. in the case.

Our conclusion is, that the demurrer to the information should be sustained, and it is so ordered.